## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

RIGOBERTO RODRIGUEZ,

        Petitioner,

v.                               No. 2:21-cv-1102 MV/DLM

ATTORNEY GENERAL
of the STATE of NEW MEXICO,

        Respondent.

### PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

**THIS MATTER** is before the Court on Petitioner Rigoberto Rodriguez's Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus, filed November 16, 2021. (Doc. 1.) On March 28, 2023, United States District Judge Martha Vázquez referred this case to me pursuant to 28 U.S.C. § 636(b)(1)(B) and (b)(3) to conduct hearings, if warranted, and to perform any legal analysis required to recommend to the Court an ultimate disposition. (Doc. 23.)

Petitioner has filed a habeas corpus petition alleging four grounds for relief. I recommend denying his Petition in its entirety.

### I.     Factual and Procedural Background

### A.  Underlying Facts of the Crimes

On January 27, 2010, between 5:00 p.m. and 5:30 p.m., Jarlena Anderson was watching television in the bedroom of an Albuquerque home she shared with her mother and sister. (Doc. 14-1 at 264–66.) Also in the home was her sister, Connie Maldonado, and her sister's estranged husband, David Maldonado. (*Id.* at 266.) Through the wall, Jarlena heard David speaking on the phone and saying he was alone at the home. (*Id.* at 268.) After the call, Jarlena heard David tell Connie that "Rigo" was coming over. (*Id.* at 268–69.) Approximately 10 minutes later, Jarlena

heard a beeping noise, which indicated the garage door had opened. (*Id.* at 273.) She then heard David say, in a fearful voice, that he did not have anything. (*Id.*) She then heard Connie say, "Don't do this here" and "don't do this at my mom's house," after which she heard a male voice say "shut the f--- up." (*Id.* at 273–74.) Jarlena heard a single gunshot, followed by Connie pleading to Rigo, "Don't do this. I won't tell. I've done time. I won't tell." (*Id.*) She also testified to hearing two male voices speaking Spanish at some point after David was killed but before her sister's murder. (*Id.* at 281.) After that, she heard "an exertion" from a male like "grunting" and then heard her sister "choking." (*Id.* at 273–74.) Jarlena heard her sister continue to plead followed by another exertion. (*Id.*) Then, she heard the beep of the garage, the slam of two car doors, and a car start. (*Id.* at 274–75.) After waiting for a few minutes to ensure the men had left, Jarlena ran next door to her other sister's home and told her they shot David and slit Connie's throat. (*Id.* at 275.)

Jarlena's sister, Benita, testified that on the night of the killings, they hear a loud pop they attributed to a western program playing on the television. (*Id.* at 307–08.) Benita testified that shortly afterwards, however, Jarlena came to the door to inform her and her husband of the killings. (*Id.* at 308.) Benita, her husband, and her father ran back to Jarlena's house right away. (*Id.* at 309.) She saw blood around David's body and Connie's throat slashed open. (*Id.* at 313.) Benita called the police. (*Id.* at 313–14.) As they waited, they noticed David's pocket was inside out and that there were incomplete shoe impressions in the carpet and incomplete bloody shoe prints. (*Id.* at 316.) Neither Jarlena nor her sister remember stepping in blood, and her sister testified to intentionally staying away from the bodies to avoid ruining evidence. (*Id.* at 317.) David's outturned pocket was swabbed for DNA, and the sample recovered did not match Petitioner or his brother.

Then-detective Paige Lavilla of the Albuquerque Police Department (APD) was the

primary agent and arrived around 8:15 p.m. (*Id.* at 536.) After speaking with Jarlena and observing the scene, including David's outturned pockets and missing cellphone, Detective Lavilla determined the scene was consistent with a robbery. (*Id.* at 542–43.) Detective Lavilla determined it was important to investigate cellphone activity near the time of the killings because David's cellphone was missing and Jarlena told her he was talking to someone just before being killed. (*Id.* at 553.)

### B. Trial Proceedings

The State presented evidence at trial regarding three cellphones: one belonging to David, a second belonging to Petitioner, and a third shared by Petitioner and his girlfriend. (*Id.* at 278–80, 357, 554–55, 558–560, 884.) Jarlena testified that after the murders, she had Connie's phone and listened to a voicemail that said, "Hey David, this is Dragon. Give me a call." (*Id.* at 279–81.) At the time, she did not know that "Dragon" was Petitioner's nickname. (*Id.* at 280.)

Detective Lavilla further testified that United States Marshal Paul Hernandez, who assisted her in obtaining cellphone records but did not testify at trial, informed her that the numbers associated with Petitioner and his girlfriend were registered to other names but belonged to them. (*Id.* at 555–56, 568–69, 884.) She further testified that Marshal Hernandez produced a map of the activity of the various cellphones in the matter and where they were located. (*Id.* at 555–56.) Detective Lavilla focused her investigation on the numbers belonging to Petitioner and his girlfriend because they appeared on David's incoming call log minutes before he was killed. (*Id.*) Defense counsel did not object to her testimony relating to Marshal Hernandez's cellphone activity map but did cross-examine Detective Lavilla about her reliance on Marshal Hernandez and her determination that Mario Martinez, an acquaintance of Petitioner and confidential informant, was credible. (*Id.* at 569.)

3

Based on Marshal Hernandez's map and her understanding of how cellphones ping off cellphone towers, Detective Lavilla learned that the cellphone belonging to Petitioner and his girlfriend made a call to David prior to the homicide. (*Id.* at 558.) She further testified that the phone was used near the location David lived and that, after the killings, it and David's cellphone traveled through Albuquerque. (*Id.*) Law enforcement found David's phone, as well as Petitioner's and the one he and his girlfriend shared, at an apartment where Petitioner, his girlfriend, and his brother were staying. (*Id.* at 559–61.) Norman Ray Clark, a records custodian for Sprint/Nextel, and Matthew Kase, a legal compliance officer in the cellular-service field, testified as to the cellphone data above. (*Id.* at 834–51, 880, 884–85.) Clark testified that the number associated with Petitioner made calls immediately before the murders to Petitioner's brother and David. (*Id.*) Kase testified to the same information. (*Id.*)

The State called Amber Dugan, an analytical assistant with the Rocky Mountain Information Network, as its final witness. (*Id.* at 904–05.) Dugan used records she received from the District Attorney's office of cellphone information associated with Petitioner's phone, David's, and the phone associated with Petitioner and his girlfriend. With those records, she created a timeline of the communications among the phones and a map showing the exact locations of the towers off which the cell phones pinged between 6:00 p.m. and 11:59 p.m. on the day of the murders. (*Id.* at 913.) The court admitted Dugan's timeline and map over trial counsel's objection of speculation/lack of foundation as a "compilation and summary of the evidence that ha[d] preceded . . . ." (*Id.* at 906–07, 912.)

The confidential informant, Mario Martinez, also testified, confirming the number of the cellphone associated with Petitioner. (*Id.* at 357.) He further testified that one night Petitioner picked him up in a black Impala and told him that with his brother's help, they killed Connie and

David as part of a robbery, shot David before cutting Connie, and threw away a pair of shoes because they had stepped in blood. (*Id.* at 357–58, 819.) Martinez also testified that Petitioner tried to give him the gun used to kill David, but that he suggested Petitioner give it to an acquaintance named Jeannie Arreguin. (*Id.* at 819–20.) The gun was never found. (*Id.* at 552.)

APD Crime Lab Detective Juliana Serna testified that a vehicle matching the description of the black Impala Martinez testified to having been picked up in was found at the address where Petitioner, his girlfriend, and his brother were staying. (*Id* at 716–23.) The car was registered to Petitioner's girlfriend. After being searched, several knives and traces of blood were discovered in the vehicle. (*Id.*) Detective Lavilla and APD Homicide Detective Russ Landavazo testified that Martinez exchanged the information he provided in an ultimately unsuccessful attempt to obtain a deal in an unrelated criminal matter. (*Id.* at 549, 816–20.) The information, however, contained details that had not been made public, such as the number of victims, the manner or order of the killings, and that there were bloody shoe prints on the carpet. (*Id.*)

Sergeant Louis Guenther, the crime scene supervisor, testified that there was a significant amount of bloodstain around the victims' bodies and confirmed there were shoe impression right next to Connie. (*Id.* at 419, 497–506.) Sergeant Guenther explained that the shoe prints would not have been useful for determining foot size because they were incomplete. (*Id.* at 507–08.) He further explained that shoe size is not necessarily indicative of foot size because feet can grow over time, and it is common for individuals to wear ill-fitting shoes on purpose. (*Id.*) Sergeant Guenther also explained that "class characteristics" of shoes are common across brands and model of a shoe, whereas "identification characteristics" are traits such as wear or damage that are unique to each shoe. (*Id.* at 509.) He opined it was not possible to determine identification characteristics of a shoe from a blood-stained carpet. (*Id.*) He further stated that he had not stepped in the blood

and spread it around the crime scene on account of his training and experience. (*Id.* at 506.)

Petitioner did not take the stand. He called Jeannie Arreguin, an individual he had known for over 30 years, as his sole witness. (*Id.* at 933.) She said that Martinez brought her a gun as collateral for drugs but had not hidden a gun for Petitioner. (*Id.* at 548–552, 928–34, 938–40, 943–45.) She stated that when Martinez failed to take the gun back, she got rid of it. (*Id.*) When asked about a February 2010 interview in which she told police that Petitioner had admitted to her that he and his brother had killed Connie and David, she said she had been high and lying. (*Id.* at 948–55.) From the transcript, it appears a CD of the interview was played to impeach her, but it was not made a part of the record. (Docs. 13-1 at 240; 14-1 at 950.)

### C. Convictions, Direct Appeal, and State Habeas Proceedings

The jury was instructed that accomplice liability applied to all crimes except the charge of felony murder. (*Id.* at 93.) On February 13, 2013, a jury found Petitioner guilty of two counts of willful and deliberate first-degree murder (Counts 1 and 3); two counts of conspiracy to commit first-degree murder (Counts 2 and 4); second-degree armed robbery (Count 5); conspiracy to commit armed robbery (Count 6); two counts of third-degree tampering with evidence (Counts 7 and 9); and conspiracy to commit tampering with evidence (Count 10). (*Id.* at 103–04.) Petitioner appealed, arguing that:

1. Detective Lavilla's testimony identifying another individual as the owner of the telephone number 435-5944 was based exclusively on what Marshal Hernandez told her and therefore constituted hearsay and violated his right to confront the marshal;

2. Amber Dugan's map and timelines constituted speculation because she created them from records she obtained from the district attorney's office;

3. The evidence was insufficient to sustain his convictions;

4. The jury was improperly instructed as to the essential elements of felony murder; and

5. Multiple conspiracy convictions violated the prohibitions against double jeopardy.

6

(*See* Doc. 13-1 at 163–64.) The state responded as follows:

1. Admitting Marshal Hernandez's unconfronted conclusion that another individual owned 435-5944, if it constituted error at all, was harmless error;

2. Amber Dugan's map and timelines were admissible under both federal and state rules of evidence;

3. The evidence was sufficient to support each of his convictions; but

4. The convictions for conspiracy should have been vacated.

(*Id.* at 259–90.) Other than remanding for the state district court to vacate his conspiracy convictions (*id.* at 366–69), the New Mexico Supreme Court affirmed, holding that:

1. Petitioner failed to present his hearsay and confrontation arguments to the district court; so the court declined to review the arguments because defense counsel might have chosen to cross-examine witnesses instead of objecting to the admissibility of the evidence to create doubt;

2. The "district court did not abuse its discretion" in admitting testimony and exhibits on which Dugan created her map and timelines "because prior testimony and exhibits that had been admitted into evidence supplied the foundation for the Dugan exhibits[;]"

3. The evidence was sufficient to support the convictions; and

4. The convictions for conspiracy should have been vacated.

(*Id.* at 348–70.)

Following the New Mexico Supreme Court's affirmance, Petitioner filed a pro se state petition for writ of habeas corpus alleging denial of:

1. Due process;

2. Trial by an impartial jury;

3. Confrontation; and

4. Effective assistance of counsel.

(*Id.* at 379.) Habeas counsel amended the petition to add claims of prosecutorial misconduct and

per se ineffective assistance of counsel and argued that Petitioner was prejudiced by trial counsel's failure to use an investigator to:

1. Scrutinize information disclosed through the neighborhood canvassing; and

2. Explore the circumstances making it extremely unlikely that Petitioner left the bloody shoe impressions observed at the crime scene.

(*Id.* 559–62.) The state habeas court held a status conference to narrow the issues for a future evidentiary hearing and summarily dismissed the prosecutorial misconduct claim but permitted the ineffective assistance claim. (*Id.* at 665–66.) At the evidentiary hearing, a senior investigator with the Law Offices of the Public Defender was the sole witness to testify. The investigator testified that based on a review of the photographs of the shoeprints and an examination of the carpet samples themselves, he determined the print size was "anywhere from an eight-and-a-half to nine-inch imprint . . . ." (Doc. 14-1 at 1125–26.) The investigator testified to having accompanied habeas counsel to the detention facility where Petitioner was located to measure the shoe he was wearing during the visit. (*Id.* at 1126–27). The investigator believed the shoe was twelve to twelve-and-a-half inches, but he did not measure Petitioner's foot. (*Id.* at 1127–31.)

The court denied the petition on two bases: first, Petitioner failed to establish per se ineffective assistance; and second, he did not demonstrate that the evidence showed he received ineffective assistance. The habeas court determined that Petitioner did not establish per se ineffective assistance because he failed to allege any facts regarding his trial counsel's decision not to hire an investigator, let alone demonstrate that his circumstances were so prejudicial that litigating under them would be unjustified. (Doc. 13-1 at 694–96.) The habeas court also determined that, under *Strickland v. Washington*, 688 U.S. 688 (1984), Petitioner failed to demonstrate he received substandard representation or that he was prejudiced by his trial counsel's decision not to hire an investigator to follow up on the neighborhood canvassing or investigate the

bloody shoe prints. (*Id.* at 696.) As to the canvassing, the court determined that the decision not to hire an investigator was not ineffective assistance because it was a reasonable trial tactic or strategy and trial counsel instead relied on cross-examination of the witnesses. (*Id.* at 697–98.) The habeas court also determined that Petitioner failed to demonstrate prejudice because he failed to identify any evidence that might have been discovered with further investigation. As to the shoe prints, the habeas court determined that trial counsel was not ineffective in failing to hire an investigator because even if he had attempted to introduce evidence regarding his shoe size, the Court determined that the strength of that evidence would not have undermined a critical piece of information. (*Id.* at 699–700.) Additionally, even if the evidence had been introduced, it would not have excluded him from the crime scene. (*Id.* at 700–01.) Accordingly, the Court determined that trial counsel's strategy of challenging the competency of the investigation was not unreasonable. (*Id.* at 701.) The court further determined that evidence indicating that the shoe prints were not Petitioner's would not have conclusively established he was not at the crime scene, in light of the extensive cellphone data presented at trial by detectives and individuals in the telecommunications industry. (*Id.* at 702.) On those bases, the habeas court denied the petition for state habeas relief.

Petitioner filed a petition for writ of certiorari, which the New Mexico Supreme Court denied. (Doc. 13 at 14.)

On November 16, 2021, Petitioner filed the 28 U.S.C. § 2254 federal habeas petition asserting before the Court in which he asserts the following four grounds for relief:

1) The trial court erroneously admitted evidence and testimony regarding cellphone data, including locations and usage.

2) There was insufficient evidence to support his convictions.

3) Trial counsel rendered ineffective assistance by failing to hire an investigator to follow up on neighborhood canvassing and investigate the bloody shoe prints.

    4)  Petitioner is actually innocent.

(Doc. 1 at 9, 11–12, 58–59.)

## II.    Legal Standards

### A.  Exhaustion of State Court Remedies

"A state prisoner generally may not raise a claim for federal habeas corpus relief unless he 'has exhausted the remedies available in the courts of the State.'" *Selsor v. Workman*, 644 F.3d 984, 1026 (10th Cir. 2011) (quoting 28 U.S.C. § 2254(b)(1)(A)). Exhaustion requires that a state prisoner pursue his claims "through 'one complete round of the State's established appellate review process,' giving the state courts a 'full and fair opportunity' to correct alleged constitutional errors." *Id.* (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)). In other words, "a state prisoner seeking federal habeas relief generally must have first submitted each of his claims to the State's highest court." *Jernigan v. Jaramillo*, 436 F. App'x 852, 855 (10th Cir. 2011) (citing *O'Sullivan*, 526 U.S. at 845; 2 Randy Hertz & James S. Liebman, *Federal Habeas Corpus Practice and Procedure* § 23.3 [b], at 1205–06 (6th ed. 2011) ("[T]he petitioner satisfies her exhaustion burden by raising a claim at all stages of the state's appellate review process (including discretionary state appeals).").

Federal courts normally will not consider unexhausted claims "unless exhaustion would have been futile because either 'there is an absence of available State corrective process' or 'circumstances exist that render such process ineffective to protect the rights of the applicant.'" *Selsor*, 644 F.3d at 1026 (quoting 28 U.S.C. §§ 2254(b)(1)(B)(i), (ii)). "The state prisoner bears the burden of proving that he exhausted state court remedies[] or that exhaustion would have been futile." *Id.* (citations omitted).

**B.  Procedural Default**

The doctrine of procedural default, an important corollary to the exhaustion requirement, "prevents a federal court from reviewing 'the merits of a claim—including constitutional claims—that a state court declined to hear because the prisoner failed to abide by a state procedural rule.'" *Williams v. Trammell*, 782 F.3d 1184, 1212 (10th Cir. 2015) (quoting *Martinez v. Ryan*, 566 U.S. 1, 9 (2012)); *see also Power v. Santistevan*, No. CV 19-1055 KWR/SCY, 2023 WL 3230522, at *4 (D.N.M. May 3, 2023), *R&R adopted*, 2023 WL 4248175 (D.N.M. June 29, 2023). "The state procedural rule at issue must be 'adequate and independent.'" *Casaus v. Hatch*, No. CV 20-1269 WJ/KK, 2023 WL 6805727, at *3 (D.N.M. Oct. 16, 2023) (quoting *Byrd v. Workman*, 645 F.3d 1159, 1167 (10th Cir. 2011)). "A state procedural rule is independent if it relies on state law, rather than federal law, and is adequate if it is firmly established and regularly followed." *Id.* (quoting *Fontenot v. Crow*, 4 F.4th 982, 1028 (10th Cir. 2021), *cert. denied*, 142 S. Ct. 2777 (2022)) (quotation marks omitted).

A petitioner may overcome procedural default "only by demonstrating cause and prejudice or a fundamental miscarriage of justice." *Gonzales v. Hartley*, 396 F. App'x 506, 508 (10th Cir. 2010) (quotation marks and citation omitted). To establish cause for having failed to abide by a state procedural rule, a petitioner must demonstrate he was prevented from doing so by some external factor. *Id.* To establish prejudice, a petitioner must demonstrate "he suffered actual prejudice as a result of the alleged violation of federal law." *Id.* (quotation marks and citation omitted). "The fundamental miscarriage of justice exception, meanwhile, is a narrow exception to the cause requirement where a constitutional violation has probably resulted in the conviction of one who is actually innocent of the substantive offense." *Id.* (quotation marks and citation omitted).

11

### C.  Mixed Petitions

Where a petitioner brings a "mixed petition" containing both exhausted and unexhausted claims, the court may:

> (1) dismiss the mixed petition in its entirety; (2) stay the petition and hold it in abeyance while the petitioner returns to state court to raise his unexhausted claims; (3) permit the petitioner to dismiss the unexhausted claims and proceed with the exhausted claims; or (4) ignore the exhaustion requirement altogether and deny the petition on the merits if none of the petitioner's claims has any merit.

*Fairchild v. Workman*, 579 F.3d 1134, 1156 (10th Cir. 2009) (quotation and internal citations omitted). "[U]nder section 2254(b)(2), where the district court is convinced the unexhausted claim is without merit, or that the issue is easily resolvable against the defendant, the court may reach the merits of the claim rather than dismiss the petition." *See Rudolph v. Galetka*, 208 F.3d 227, at *1 (10th Cir. 2000).

### D.  28 U.S.C. § 2254 Standard

28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996, 110 Stat. 1214, governs Petitioner's petition. A prisoner in state custody seeking federal habeas corpus relief under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act (AEDPA), faces a "formidable barrier to [obtaining] federal habeas relief . . . ." *Burt v. Titlow*, 571 U.S. 12, 15, 19 (2013) (explaining that AEDPA's amendments create a high threshold for relief because "state courts have the solemn responsibility equally with the federal courts to safeguard constitutional rights" and are "presumptively competent" to do so) (quotation marks and citations omitted). Indeed, the Supreme Court has stated repeatedly that the standard by which federal courts are to review state court rulings is a "highly deferential standard for evaluating state-court rulings." *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997).

To carry his burden under that exacting standard, a prisoner's habeas corpus petition must show that the state court decision "(1) was contrary to, or involved an unreasonable application of, clearly established federal law or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceeding." *Cortez-Lazcano v. Whitten*, 81 F.4th 1074, 1082 (10th Cir. 2023) (quoting 28 U.S.C. § 2254(d)) (quotation marks and brackets omitted).

"Clearly established law" refers to Supreme Court holdings at the time of the state-court decision. *See Williams v. Taylor*, 529 U.S. 362, 412 (2000). A state court decision is contrary to, or involves an unreasonable application of, clearly-established law if it applies a rule contradicting law set out by a Supreme Court decision, or if it is faced with a set of facts "materially indistinguishable from" facts the Supreme Court has previously considered but arrives at a different conclusion than the Supreme Court. *See id.* at 405–06.

To highlight the deference owed to state court decisions, the Supreme Court has stated that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Williams*, 529 U.S. at 410). In other words, to establish an *unreasonable* application of federal law, a petitioner must "show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error . . . beyond any possibility for fairminded disagreement." *Burt*, 571 U.S. at 19–20 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). Accordingly, a federal court may not grant a § 2254 petition simply because it "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Torres v. Mullin*, 317 F.3d 1145, 1151 (10th Cir. 2003) (quoting *Williams*, 529 U.S. at 411). Indeed, "even a strong case for relief does not mean that the state court's contrary conclusion was unreasonable." *Harrington*, 562 U.S. at 102 (citation omitted). "If this standard is difficult to meet, that is because

it was meant to be." *See id.* "As amended by AEDPA, § 2254(d) . . . preserves authority to issue the writ in cases where there is *no possibility* fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents. It goes no further." *Id.* (citation omitted) (emphasis added).

### E.  Actual Innocence

"A distinction exists between claims of actual innocence used as a gateway and as a freestanding basis for habeas relief." *Farrar v. Raemisch*, 924 F.3d 1126, 1130 (10th Cir. 2019). The distinction depends on whether the claim is used as a procedural mechanism or as a basis for relief. *See id.* A gateway claim enables a petitioner "to overcome a procedural bar in order to assert distinct claims for constitutional violations." *Id.* (quoting *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013) (quotation marks omitted). Because a gateway claim is procedural, it does "not provide a basis for relief." *Id.* at 1130–31 (quoting *Schlup v. Delo*, 513 U.S. 298, 314–15 (1995)) (quotation marks omitted). "By contrast, a freestanding claim asserts actual innocence as a basis for habeas relief." *Id.* at 1131 (citations omitted). The Supreme Court of the United States has repeatedly approved of gateway claims and repeatedly rejected freestanding claims. *Id.* (citing *Herrera v. Collins*, 506 U.S. 390, 400 (1993)).

"[A] petitioner does not meet the threshold requirement [for gateway claims] unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *McQuiggin*, 569 U.S. at 386 (citation omitted). Indeed, "[w]ithout *any* new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim." *Schlup*, 513 U.S. at 316 (emphasis added).

### III.   Analysis

Respondent argues that Petitioner brings a mixed petition with both exhausted and unexhausted claims, but it waive the exhaustion requirement and argue that the Court should dismiss the entire petition with prejudice because Petitioner failed to satisfy the applicable standards for relief. (Doc. 13 at 1.) As explained below, the Court finds all Petitioner's claims are meritless and "easily resolvable against" him, so to the extent any are unexhausted, it is appropriate for the Court to exercise its discretion to reach their merits. *See Rudolph*, 208 F.3d at *1 (quoting *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)). Thus, the Court recommends ignoring the exhaustion requirement and denying the entire petition on the merits. *See id.* ("[W]here the district court is convinced the unexhausted claim is without merit, or that the issue is easily resolvable against the [petitioner], the court may reach the merits of the claim rather than dismiss the petition.") (discussing 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.")).

Whether a petitioner will prevail depends on his ability to demonstrate that the trial court's decision was based on an unreasonable application of federal law. As stated above, however, that standard is incredibly difficult to satisfy and only when a petitioner demonstrates there is no possibility of fairminded disagreement may a federal court find that a state court applied federal law unreasonably. The Court finds that Petitioner did not meet his burden of demonstrating the trial court applied federal law unreasonably in this case. Accordingly, the Court recommends denying his petition.

**A. Petitioner's challenge to the trial court's admission of cellphone data and testimony is barred.**

Petitioner argues that the trial court erred by admitting the timelines and map Amber Dugan created and the map provided to Detective Lavilla by Marshal Hernandez. (Doc. 1 at 9.) As an initial matter, the Court may not consider Petitioner's claim insofar as it alleges an error occurred based on the application of state law. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("[R]eemphasiz[ing] that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68 (citations omitted). Although it is not a federal court's role to "second-guess state courts about the application of their own laws[, . . . a] prisoner may seek relief . . . if a state law decision is so fundamentally unfair that it implicates federal due process." *Leatherwood v. Allbaugh*, 861 F.3d 1034, 1043 (10th Cir. 2017) (quotation omitted). To do so, a petitioner cannot merely attach a due process label and must instead refer to a specific constitutional guarantee and include a statement of the facts entitling him to relief. *See id.*

Here, Petitioner presents two arguments. First, Petitioner generally alleges that the trial court erred in admitting timelines and maps related to various cellphones. (Doc. 1 at 9.) Second, he argues that the trial court "allowed testimony of hearsay of a U.S. Marshal[] that never took the stand. This [is a] violation of Petitioner's 6th Amendment Rights." (*Id.*) As it relates to his generalized challenge to the admission of cellphone evidence, the Court finds that it is based entirely on the application of state evidentiary law and Petitioner does not allege a specific constitutional violation. Additionally, the Court finds that Petitioner's challenge to Marshal Hernandez's testimony was a conclusory statement that does not include a statement of the facts drawing a connection between his constitutional right and the alleged violation, let alone one that

16

makes his claim cognizable. *See Leatherwood*, 861 F.3d at 1043. In other words, it appears that Petitioner's arguments either relate only to the trial court's evidentiary rulings, which the Court may not review, or they fail to draw an adequate connection between his constitutional right and an alleged violation.

In any event, the Court also finds that Petitioner's challenge to the admission of Marshal Hernandez's testimony is procedurally defaulted.[1] As the New Mexico Supreme Court explicitly stated, Petitioner raised the hearsay and confrontation claim "for the first time on appeal," so it "decline[d] to review the[] newly-raised objection because [they] were not made to the district court . . . ." (Doc. 13-1 at 356 (citing *New Mexico v. Neswood*, 51 P.3d 1159, 1163–64 (N.M. 2002)).) The state court of appeals case that the New Mexico Supreme Court cited, *Neswood*, quotes the New Mexico Rule governing timeliness of objections, so the court's decision was based entirely on state law, and is thus independent. *See Neswood*, 51 P.3d at 1163 ("Rule 11-103(A)(1) NMRA 2002 requires that objections be timely."). *Neswood* also demonstrates that the procedural rule is firmly established and regularly followed, and therefore adequate, because in this matter, the New Mexico Supreme Court applied the principle stated in *Neswood* over 20 years later. Accordingly, the Court finds that the claim is procedurally barred.

Additionally, Petitioner fails to demonstrate cause and prejudice that will result in a fundamental miscarriage of justice if the claim is deemed to be procedurally barred and not

---

[1] Although Petitioner's "pro se . . . pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers[,]" *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005) (quoting *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991)), the Court may not "serv[e] as the litigant's attorney in constructing arguments and searching the record." *Id*. (citing *Hall*, 935 F.2d at 1110). The Court notes that Petitioner does not allege a constitutional violation related to the admission of Amber Dugan's timeline and map, and it was Petitioner's obligation to present that argument. (*Id.*) The Court is not obligated to discern an argument from over two thousand pages of filings in the record. Because there is no constitutional allegation, and the claim alleges an error based only on state evidentiary law, the Court recommends finding the issue is resolved squarely as lying outside the scope of a federal habeas review.

considered. The Court first notes that Petitioner does not provide any allegations from which the Court might discern a cause for having failed to timely object to the admission of the evidence, and the Court is not obligated to search the record for any. *See Garrett*, 425 F.3d at 840. Moreover, Petitioner failed to demonstrate he was prejudiced by the admission of Marshal Hernandez's testimony. As the New Mexico Supreme Court highlighted, the only phone number not accounted for by other testimony or evidence was that of Cassandra Kelso. (*See* Doc. 13-1 at 352.) As Respondent notes, however, that information might have been relevant to Petitioner's conspiracy counts, but it was not material to any others and those counts were otherwise supported by sufficient evidence. (Doc. 13 at 28.) Respondent also emphasizes that the New Mexico Supreme Court determined Petitioner's conspiracy counts were supported by additional evidence establishing his "guilt beyond a reasonable doubt." (*Id.* (quoting Doc. 13-1 at 357).) Therefore, setting aside Petitioner's failure to demonstrate cause for the untimely objection, he also failed to demonstrate he will be prejudiced, let alone prejudiced to such a degree that it will be a fundamental miscarriage of justice. Accordingly, the Court recommends denying Petitioner's first claim because the decisions he challenges are outside the scope of federal habeas review and insufficiently pled or procedurally barred.

### B. Petitioner failed to demonstrate that the trial court erred in determining the evidence was sufficient to support his convictions.

Petitioner claims there was insufficient evidence to support his convictions because the DNA evidence from David's pocket belonged to an unidentified individual and therefore excluded him and because he was found guilty based on Mario Martinez's testimony, who he claims was later deemed to be not credible. (Doc. 1 at 11.) Petitioner's habeas counsel conceded the sufficiency of the evidence to support his convictions. Even if habeas counsel had not conceded the sufficiency of the evidence, the Court finds that Petitioner did not demonstrate the trial court

unreasonably applied clearly-establish federal law in determining the evidence was sufficient to support his convictions. The Court also finds that the record does not support Petitioner's claim that Martinez was ultimately deemed to be not credible. Accordingly, the Court recommends finding that Petitioner did not satisfy his burden of establishing eligibility for habeas relief.

In the amended state habeas petition, habeas counsel argued that the evidence, "although sufficient to sustain the convictions in this matter - is especially susceptible to attack in post-conviction proceedings because of its extreme dependence on the testimony of convicted felon Mario Martinez." (Doc. 13-1 at 541.) Based on that statement, the Court finds that his habeas counsel conceded the issue of whether the evidence was sufficient to support his convictions. *See Coleman v. Thompson*, 501 U.S. 722, 753 (1991) ("[T]he attorney is the petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petitioner must bear the risk of attorney error.") (quotation marks and citations omitted); *see also Link v. Wabash R. Co.*, 370 U.S. 626, 634 (1962) ("[E]ach party is deemed bound by the acts of his lawyer-agent . . . ."); *Frank v. Bloom*, 634 F.2d 1245, 1251 (10th Cir. 1980) (holding that a litigant was "bound by his lawyer's admissions on his behalf").

Assuming *arguendo* that habeas counsel had not conceded the issue, the Court nevertheless finds that the trial court did not unreasonably determine that the evidence was sufficient to support Petitioner's convictions. When reviewing the sufficiency of the evidence to support a criminal conviction, a court is not required "to ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979) (quotation marks and citation omitted). "Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319 (citation omitted).

19

To determine whether any rational trier of fact could have made such a finding, a court must look to "both direct and circumstantial evidence." *Lucero v. Kerby*, 133 F.3d 1299, 1312 (10th Cir. 1998) (citation omitted). In doing so, however, a "court may not weigh conflicting evidence nor consider the credibility of witnesses, but must accept the jury's resolution of the evidence as long as it is within the bounds of reason." *Id.* (quotation marks and citation omitted). Indeed, even where the evidence supporting a conviction is supported entirely by circumstantial evidence, it need not "conclusively exclude every reasonable hypothesis except guilt [and t]he evidence must only reasonably support the jury's finding of guilt beyond a reasonable doubt." *United States v. Hager*, 969 F.2d 883, 888 (10th Cir. 1992), *abrogated on other grounds by Bailey v. United States*, 516 U.S. 137 (1995) (quotation marks and citations omitted). Courts determine whether evidence is sufficient to support a conviction by applying the standard above but look to state law to identify the substantive elements of a criminal offense. *See Coleman v. Jackson*, 566 U.S. 650, 655 (2012).

In New Mexico, robbery "requires, and is designed to punish, the element of force [. . . and] is not merely a property crime, but a crime against a person." *New Mexico v. Bernal*, 146 P.3d 289, 296 (N.M. 2006) (citations omitted). In other words, "[a] robbery conviction requires that the force or threatened use of force must be the lever that serves to separate the property from the victim." *Id.* (quotation omitted). The jurors here were instructed as to accomplice liability—i.e., that Petitioner should be found guilty if they determined he intended the crime be committed, the crime was committed, and Petitioner helped, encouraged, or caused the crime to be committed. (Doc. 13-1 at 93; 363.) The evidence the jury considered tending to prove Petitioner's involvement in the armed robbery included:

> (1) Mario Martinez's testimony that [Petitioner] admitted that he and his brother had killed David and Connie as part of a robbery; (2) Jarlena's testimony that (a) she overheard David tell Connie that "Rigo" was coming over, (b) with awareness that two men had entered her house, Jarlena overheard David, with "fear in his

20

voice" state "that he didn't have anything," and (c) she heard Connie offer up leather jackets; and (3) the fact that David's phone was recovered from an apartment at which [Petitioner] was staying.

(Doc. 13 at 31.)

Petitioner's direct appeal counsel argued that the fact Petitioner was excluded as a possible contributor of the DNA found in David's pocket meant there was no evidence violence was the mechanism by which David's cellphone was taken. (Doc. 13-1 at 200.) Direct appeal counsel further argued that the evidence did not suggest David was killed in order to take his phone, which might have been taken as an afterthought. (*Id.* at 201.) The New Mexico Supreme Court, however, rejected that argument, concluding that "[k]illing . . . David [was] precisely the use of force that served as the lever to separate [him] from his property." (*Id.* at 358.) Accordingly, the court determined that "substantial evidence support[ed Petitioner's] armed robbery conviction . . . ." (*Id.* at 359.) The Court finds that the New Mexico Supreme Court's determination is consistent with what any rational trier of fact might have concluded as to the sufficiency of the evidence.

Additionally, the Court finds Petitioner's contention that he was found guilty solely from Mario Martinez's testimony, and that Martinez was later found to be uncredible, is not supported by the record. As Respondent highlights, Petitioner's contention ignores the significant amount of technical evidence the jury considered relating to cellphone numbers, cell towers, phone records, documented calls between cellphones, and movement data of the cellphones provided by detectives and witnesses familiar with telecommunications. (Doc. 13 at 31.) That suggestion further discounts Jarlena's testimony that David told Connie that "Rigo" was coming over, as well as Jeanie Arreguin's original statement to police that Petitioner had confessed to her. (*Id.* at 32.) Lastly, Martinez's testimony was not found to be uncredible. Indeed, Detectives Lavilla and Landavazo found him to be credible because he was able to provide accurate details about the murders that had not been made public. (Doc. 14-1 at 157, 816–20.) Detective Lavilla also stated

21

that on a number of unrelated matters in the past, Martinez had provided her with information that she was able to verify. (*Id.* at 157.)

The Court notes that Respondent only explicitly addresses whether the evidence supported Petitioner's armed robbery conviction. (*See* Doc. 13 at 28 –32.) Upon review of the New Mexico Supreme Court's decision, however, the Court finds that the court did not unreasonably determine the trial court had sufficient evidence to support the remaining convictions.[2] The court determined that the testimony from Jarlena; the significant amount of cellphone data, including the location at which David's phone was found being the address at which Petitioner was staying; the black Impala Martinez testified Petitioner drove also being located at that address; the black Impala being registered to Petitioner's girlfriend; Martinez's testimony; the various detectives' testimony; and Jeannie's initial interview statements all supported Petitioner's murder convictions. (Doc. 13-1 at 361–362.) The New Mexico Supreme Court also determined that the evidence listed above supported the determination that Petitioner was guilty of the first-degree murder of Connie. (*Id.* at 362 (citing NMSA 1978 § 30-2-1 (A)(1)'s requirement of evidence of a deliberate intent—i.e., a calculated judgment—to kill).) The court highlighted that the jury was instructed on accomplice liability for the murder and was presented with evidence that Petitioner and his brother spoke in Spanish after Connie begged for her life, ignored her pleas for mercy, and subsequently murdered her with a knife. (*Id.* at 362–63.) The court reasoned that, under the theory of accomplice liability, even if the jury had determined Petitioner did not kill Connie, they could have reasonably determined that their discussion in Spanish satisfied the accomplice element of counseling or

---

[2] The Court notes that direct appeal counsel did not challenge the convictions for tampering with evidence (*see id.* at 199–207), and Petitioner does not address those convictions (*See generally* Doc. 1). However, to the extent Petitioner challenges those convictions, his claims would be procedurally barred for failure to challenge them on direct appeal based on the same reasoning his confrontation claim is barred—i.e., failure to adhere to a state rule of procedure. *See supra* Section (III)(A); *see also Stanley v. N.M. Game Comm'n*, 539 P.3d 1224, 1241 (N.M. Ct. App. 2023) ("To preserve an issue for review on appeal, it must appear that the appellant fairly invoked a ruling of the trial court on the *same grounds* argued in the appellate court.") (citing Rule 12-321(A) NMRA).

encouraging his brother to deliberately murder Connie. (*Id.* at 363.) Thus, the court determined substantial evidence supported a first-degree murder conviction. (*Id.* at 362–63.) Accordingly, the Court recommends denying Petitioner's claim for failure to demonstrate the state courts unreasonably determined there was sufficient evidence to support his convictions.

### C.  Petitioner does not demonstrate that the state habeas court unreasonably denied his ineffective assistance of counsel claim.

Petitioner repeats arguments the state habeas court already rejected, including his claim that he received per se ineffective assistance of counsel due to his trial counsel's failure to hire an investigator. (Doc. 1 at 12.) As to this claim, Petitioner does not identify any clearly established federal law that failure to hire an investigator is per se ineffective assistance, which is sufficient to deny habeas relief. *See Grant v. Royal*, 886 F.3d 874, 889 (10th Cir. 2018) ("The absence of clearly established federal law is dispositive under § 2254(d)(1) and results in the denial of habeas relief.") (quotation marks and citation omitted).

In any event, to succeed on an ineffective assistance of counsel claim, a petitioner must show 1) that he received substandard representation and 2) that, but for the substandard representation, the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 687. Critically, however, "[i]n order to succeed on an ineffective-assistance claim, a petitioner must satisfy both prongs of the Strickland test." *Ellis v. Raemisch*, 872 F.3d 1064, 1085 (10th Cir. 2017) (citing *Strickland*, 466 U.S. at 687). The Court notes that Petitioner does not argue that the state habeas court unreasonably applied *Strickland*. (*See* Doc. 1 at 12.)

Because Petitioner does not support his claim of per se ineffective assistance with any authority and fails to allege the state habeas court unreasonably applied *Strickland* in finding he was not prejudiced in denying his claim, the Court finds that he fails to demonstrate he is entitled to federal habeas relief.

23

**D. Petitioner's actual innocence claim is barred for failure to demonstrate new evidence of actual innocence.**

Petitioner claims he "presented a prima facia" claim of actual innocence. (Doc. 1 at 58.) To bring a gateway actual innocence claim, a petitioner must present new evidence of innocence. *See McQuiggin*, 569 U.S. at 386. Here, Petitioner has failed to do so, thus defeating his ability to bring an actual innocence claim. *See id.* The facts Petitioner alleges are not new. Indeed, Petitioner's actual innocence claim relies entirely on evidence and arguments he presented to the habeas court. (*Id.* at 58–59.) Nowhere does Petitioner argue that there is any new evidence of actual innocence, let alone new evidence so compelling that "no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *See McQuiggin*, 569 U.S. at 386. (*See generally* Doc. 1.)

The Court acknowledges the Tenth Circuit's rule that "new" evidence need not be newly discovered evidence but rather evidence simply not presented at trial. *See Fontenot v. Crow*, 4 F.4th 982, 1031–34 (10th Cir. 2021). The measurements of the bloody shoe prints were not presented at trial, but the Court finds that such evidence would not have satisfied the standard. As the habeas court highlighted, even if evidence of the shoe prints had been introduced, it would not have changed the outcome of Petitioner's case. In other words, even if Petitioner had presented the only possible new evidence available, it would not have been so compelling that "no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *See McQuiggin*, 569 U.S. at 386. Accordingly, the Court recommends denying Petitioner's actual innocence claim for failure to argue, let alone present, new evidence sufficient to demonstrate actual innocence.

**IV.     Recommendation**

The standard for a petitioner to demonstrate he is entitled to federal habeas relief requires a federal court to do more than disagree with a state court decision or even find that the state court's decision was incorrect. A federal court must determine that "that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error . . . beyond any possibility for fairminded disagreement." *Burt*, 571 U.S. at 19–20. Petitioner failed to satisfy that standard in the arguments he made in support of his four grounds for relief. The Court is not persuaded that the state courts' decisions were wrong, let alone that they applied clearly established federal law unreasonably.

Accordingly, for the reasons stated above, the Court recommends denying the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody. (Doc. 1.)

**THEREFORE, IT IS RECOMMENDED** that Petitioner's Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody be **DENIED**.

---

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the 14-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**

---

_____
DAMIAN L. MARTINEZ
UNITED STATES MAGISTRATE JUDGE